**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

**SALLY ANN ZWICKER,**

**Plaintiff,**

**v.**

**CINCINNATI PUBLIC SCHOOLS,**

**Defendant.**

**Case No. 1:24-cv-614**

**JUDGE DOUGLAS R. COLE**

**OPINION AND ORDER**

Sally Zwicker is a deaf person who teaches American Sign Language (ASL) at Cincinnati's Schroder High School. Due to her deafness, she cannot speak. She also does not read lips. As a result, she cannot directly communicate with her students who are not yet proficient in ASL. So Zwicker wants an ASL interpreter with her in the classroom as a disability accommodation. But the Cincinnati Public Schools (CPS) do not want to provide one, or at least that is what Zwicker says. So Zwicker sued CPS, raising five counts charging various theories of disability discrimination. CPS now moves for summary judgment on all of Zwicker's claims. (Doc. 24). For the reasons explained below, the Court **GRANTS** in part and **DENIES** in part CPS's motion.

## BACKGROUND

CPS first hired Zwicker in 2021. (Doc. 29-1, #979). Soon after that, Zwicker presented a note from her physician requesting that CPS provide her with an interpreter as a disability accommodation. (*See* Doc. 17-2, #502–03). According to both Zwicker and her physician, she needs one to effectively do her job. (Doc. 29-1, #980).

CPS tried to do so, sort of. During Zwicker's first few months at CPS she had no dedicated interpreter. (Zwicker Dep., Doc. 17, #362). Rather CPS sought to address her needs with interpreters from its hearing and speech center (who ordinarily accompany deaf students and thus are called student interpreters). Unfortunately, coverage proved spotty, making things difficult for Zwicker. (*Id.* at #362–63). But that changed in the late fall of the 2021–22 school year. Julia Cruz, then one of CPS's student interpreters, quit that job to become Zwicker's permanent interpreter. (*Id.* at #370–71; Doc. 29-1, #984–85). Cruz continued in that role for about two years—the remainder of the 2021–22 school year and the 2022–23 year. (Doc. 17, #370–71). During that time, things generally went well. But when, on occasion, Cruz was absent, CPS had trouble finding a replacement. (*Id.* at #373).

Cruz resigned in the summer of 2023, which led to renewed difficulties. (*Id.*). CPS eventually secured consistent interpreter coverage, but by then Zwicker had spent more than a semester teaching with only sporadic coverage. (*Id.* at #364–65). The 2023–24 school year's challenges are the primary basis for Zwicker's suit. (*Id.*).

In early July of 2023, soon after Cruz resigned, Zwicker emailed her principal—Lavaugn Neal—to alert her to "the urgency of hiring a new, permanent interpreter," since she did not want to repeat the "disruptive" experience of early 2021. (Doc. 17-3, #505). She then emailed and met with Keith Grace. At the time, he was in CPS's Human Resources department and thus was among those responsible for handling accommodation requests from employees. (Grace Dep., Doc. 13, #141–42, 169). He first attempted to get one of the interpreters CPS already had on staff to

take the job. (*Id.* at #170). But no student interpreters were willing to change jobs, and there were no other ASL interpreters on staff at the time. (*Id.* at #170–71). Efforts to hire a new staff interpreter before the school year failed; and, while CPS continued to seek out a staff interpreter, it never found a willing and suitable applicant. (*See* Doc. 17-7, #516–20; Doc. 11-1).

That meant Zwicker was without a dedicated interpreter when the school year started in 2023. CPS tried a few things to remedy this problem. As mentioned, it continued to seek candidates for a full-time staff interpreter position. (Doc. 17-7, #516–20). And because things looked bleak on that front, CPS turned to contracting with various agencies for temporary interpreters. (Doc. 13, #176–77). Unfortunately, this proved quite unreliable—even on the (inconsistent) occasions when the agency agreed to send someone, the contracted interpreter often never showed up. (*Id.*). So everyone was back to square one.

During this time, Zwicker estimates that she was without an interpreter roughly 75–80% of the time. (Doc. 17, #404). Sometimes, if there was a deaf student in the class, their assigned student interpreter was present. (*Id.* at #405). But these student interpreters were there to help their assigned student, of course, not all students. And they, too, were absent a significant amount of the time at any rate. (*Id.* at #405–06). Beyond interpreters, CPS would sometimes place a teacher's aide or security guard in Zwicker's room to at least enable her to respond to emergencies. (*Id.* at #403–04). But all agree that, for most of her time teaching at the beginning of the

2023–24 school year, Zwicker went without effective accommodation. (Doc. 29-1, # 992–99).

Realizing the difficulties of finding a staff interpreter, and mindful of payroll expenses, Grace and CPS's HR director, Julia Indalecio, considered whether some alternative to an in-person interpreter might work. (Doc. 13, #221–22; Indalecio Dep., Doc. 19, #586–87). But nobody, including Zwicker, knew of any assistive technology or other alternative that could save the day. (Doc. 13, #222). So the status quo continued—CPS renewed its efforts to find a staff interpreter while the parties made do with the unreliable agency interpreters.

During this period, naturally, there was some uncertainty about how best to proceed. To consider the various options, CPS called a meeting in November 2023 that included Zwicker, her union representative, Grace, Indalecio, and CPS's general counsel, Daniel Hoying. (Doc. 17, #438–39; Hoying Dep., Doc. 11, #86–87). The parties have competing accounts of this meeting to say the least.

First, Zwicker's version. She says "it seemed as though they were planning on making me lose my job for asking for interpreters." (Doc. 17, #439). The meeting, she says, was "accusatory" rather than an "interactive dialogue," as Hoying "strongly recommended that [she] resign." (*Id.* at #438). This came after, on Zwicker's telling, CPS told her it was too costly to hire a full-time interpreter. (*See* Doc. 19, #597). Additionally, Zwicker claims that Grace aggressively told her that it was her responsibility to find an interpreter, not CPS's. (Doc. 17, #438–40).

CPS's telling, perhaps not surprisingly, is more benign. CPS's participants relate that this meeting was where they concluded, after discussing the matter with Zwicker, that there was no possible accommodation for her other than a live interpreter. (Doc. 13, #222). So they decided to continue posting the staff interpreter position while attempting to cover as much of her schedule as they could with contract interpreters. In short, they decided to "do everything [they] could to allow her to be … a successful teacher at Cincinnati Public Schools." (Doc. 11, #83).

By January of 2024, CPS secured a contract with an agency that provides interpreters, and for the rest of the school year, coverage improved. (Doc. 13, #224). By the end of that school year, CPS had spent $33,210 on contract interpreters—and that with the agency filling only 69% of CPS's requests. (Doc. 19, #619–20). CPS and the agency calculated that the projected cost over the entire 2024–25 school year would be $113,400. (*Id.*).

So in July of 2024, Grace sent Zwicker a letter on behalf of CPS. In CPS's view, the expense of covering her interpreter needs through using outside agencies was "unsustainable." (Doc. 11-1, #122). Further, citing CPS's budget deficit, which had already resulted in CPS eliminating multiple positions, Grace advised Zwicker that CPS would "separate services" with her "as an employee," if it could not fill the interpreter position. (*Id.*). Ultimately it was unable to do so. But instead of firing Zwicker, CPS contracted with a different agency which delivered interpreters—to both CPS and Zwicker's satisfaction—throughout the 2024–25 school year. (Doc. 17, #364–65). Still, though, Zwicker fears CPS may eventually fire her. (*See id.* at #441).

In February of 2024, Zwicker filed a Charge of Discrimination with the Equal Employment Opportunity Commission's (EEOC) Cincinnati area office. (Doc. 1, #13). On July 31, 2024, the EEOC issued her a Notice of Right to Sue. (*Id.*). Zwicker sued within 90 days of that, so her suit is timely under 42 U.S.C. § 2000e-5(f)(1). (*See id.*). Plaintiff asserts her rights under federal anti-discrimination statutes and has causes of action under 42 U.S.C. § 2000e-5 and 29 U.S.C. § 794a, so this case "arises under" federal law. 28 U.S.C. § 1331. And her state-law claims are related to her federal-law claims. *See* 28 U.S.C. § 1367. In terms of relief, she seeks damages for the emotional harm she alleges she suffered as a result of CPS's shoddy efforts to accommodate her need for an ASL interpreter during the 2023–24 school year and injunctive relief to require CPS to continue supplying her with an ASL interpreter in the future. (*See* Doc. 1, #18–19).[1] CPS has since moved for summary judgment, which is now fully briefed. (Doc. 24; Doc. 29; Doc. 30). The Court thus has jurisdiction, and the matter is ripe for decision.

## LEGAL STANDARD

A party can win summary judgment on an issue if they "show[] that there is no genuine dispute as to any material fact" and that they are "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In evaluating a motion for summary

---

[1] Her claim for injunctive relief may seem puzzling at first blush. CPS is currently providing her with her requested accommodation. One might wonder, then, whether that aspect of her claim presents a controversy of "sufficient immediacy and reality" for a federal court to constitutionally rule on it. *Golden v. Zwickler*, 394 U.S. 103, 109 (1969). Zwicker has evidence that CPS has persistently raised the possibility of firing her instead of renewing the contract with the interpreting agency. So she has a basis for her "concern[] about [her] future income." (Doc. 17, #441). She thus faces (and faced at the time the complaint was filed) a realistic threat of future injury. *See City of Los Angeles v. Lyons*, 461 U.S. 95, 101–102 (1983).

judgment, the Court must keep in mind that "[t]he 'party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion and identifying those portions' of the record which demonstrate 'the absence of a genuine issue of material fact.'" *Rudolph v. Allstate Ins. Co.*, No. 2:18-cv-1743, 2020 WL 4530600, at *3 (S.D. Ohio Aug. 6, 2020) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). But the non-moving party cannot defeat a motion for summary judgment merely by pointing to *any* factual dispute. Rather, "the requirement is that there be [a] genuine issue of material fact." *Int'l Outdoor, Inc. v. City of Troy*, 974 F.3d 690, 697 (6th Cir. 2020) (emphasis omitted) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986)).

In short, the nonmoving party must present some "sufficient disagreement" that would require submission to a jury. *Moore v. Phillip Morris Cos., Inc.*, 8 F.3d 335, 340 (6th Cir. 1993) (quoting *Anderson*, 477 U.S. at 251–52). In deciding whether they have made a sufficient showing for a reasonable jury to find for them, though, the Court must view the evidence in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). That is, "the court must afford all reasonable inferences … to the nonmoving party." *Cox v. Ky. Dep't of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995).

## LAW AND ANALYSIS

Zwicker asserts five claims in all. Three of them—one under the ADA (42 U.S.C. § 12112), one under the Rehabilitation Act (29 U.S.C. § 794), and one under Ohio law (Ohio Rev. Code Ann. (R.C.) § 4112.02)—relate to CPS's alleged failure to

accommodate her disability. (Doc. 1, #14–16). The remaining two claims assert retaliation—one under the ADA and one under Ohio law. (*Id.* at #16–17). The Court, though, need only perform one failure-to-accommodate analysis and one retaliation analysis. That is because: (1) the ADA and the Rehabilitation Act "provide the same remedies, procedures, and rights" and thus can be analyzed together, *S.S. v. E. Ky. Univ.*, 532 F.3d 445, 453 (6th Cir. 2008) (citing *Thompson v. Williams Cnty.*, 219 F.3d 555, 557 n.3 (6th Cir. 2000)), and (2) "Ohio's disability discrimination law parallels the ADA in all relevant respects," *Daugherty v. Sajar Plastics, Inc.*, 544 F.3d 696, 702 (6th Cir. 2008). With that cleared up, the Court begins with Zwicker's claim that CPS violated the ADA by failing to accommodate her disability.

### A. The Court Denies Summary Judgment on Zwicker's Failure-to-Accommodate Claim Because She Has Raised a Genuine Dispute of Material Fact.

The ADA forbids discrimination "against a qualified individual on the basis of disability." 42 U.S.C. § 12112(a). One way of violating this command is failing to "mak[e] reasonable accommodations to the known physical or mental limitations" of an employee who fits the Act's definition of "qualified individual"—an employee who "can perform the essential functions" of their desired position "with or without reasonable accommodation." *Id.* §§ 12112(b)(5)(A), 12111(8). An employer can defend, however, on ground that providing the accommodation would "impose an undue hardship on the operation of [their] business." *Id.* § 12112(b)(5)(A).

Failure-to-accommodate claims are analyzed in the direct-evidence framework. *Kleiber v. Honda of Am. Mfg., Inc.*, 485 F.3d 862, 869 (6th Cir. 2007). That framework

has three steps. First, the employee has the burden of establishing that they are disabled. *Id.* Second, they must establish that they can perform the essential functions of their desired position despite their disability either "without accommodation, with an [allegedly] essential job requirement eliminated, or with a proposed reasonable accommodation." *Id.* (citation modified). Steps one and two are the plaintiff's prima facie case; at step three, the employer has the burden of establishing either that any job requirement the plaintiff seeks to avoid actually is essential or that the proposed accommodation would "impose an undue hardship" on their operations. *Id.*; *see also Blanchet v. Charter Commc'ns, LLC*, 27 F.4th 1221, 1228 (6th Cir. 2022).

CPS moved for summary judgment only on the ground that Zwicker has not made out the prima facie case. (Doc. 24-1, #813). That is, CPS does not argue that providing an ASL interpreter constitutes an undue hardship. And even as to the prima facie case, all agree that the first element is met—Zwicker is disabled. (*Id.*; *see* Doc. 29-1, #979–81). So the motion comes down to the remaining element, which CPS attacks on two fronts: it says (1) that Zwicker cannot perform the essential functions of an ASL teacher even with her proposed accommodation, and (2) that, even if she could, her proposed accommodation is unreasonable. (Doc. 24-1, #816–17). As explained below, the Court denies summary judgment based on the arguments that CPS has presented because, making reasonable inferences in Zwicker's favor, a jury could side with her on the disputed element of her prima facie case.

### 1. Essential Functions

The essential functions of an ASL teacher, the parties agree, include: delivering lessons, preparing and grading assignments, evaluating and providing feedback to students, managing classroom behavior, communicating with substitute teachers, collaborating with other teachers on curriculum development, and participating in faculty and professional development meetings. (Doc. 1, #3; Doc. 24-1, #814). The parties essentially dispute whether, assuming an interpreter is present, it actually is Zwicker—and not the interpreter—who is performing these functions. (*Compare* Doc. 24-1, #816 ("Ms. Zwicker would have an interpreter complete … essential functions.") *with* Doc. 29, #964 ("The role of the ASL interpreter is to facilitate access to the environment and communication.")). In other words, CPS claims that, when an interpreter is there, the interpreter is performing at least some of the "essential functions" of a teacher, meaning that Zwicker is not performing *all* the essential functions. If CPS is correct, that poses a problem for Zwicker, as the Sixth Circuit has held that an accommodation cannot relieve the employee of the obligation to personally perform any part of an essential function of their job. *See Bratten v. SSI Servs., Inc.*, 185 F.3d 625, 632–33 (6th Cir. 1999). In short, any accommodation that does so is per se unreasonable. *Id.*

While Defendant's argument has some logical force given the facts here, the Court ultimately disagrees with it. True, it seems somewhat odd to say that an accommodation that requires a second person to be present with a teacher in the classroom to communicate with students does not shift at least some essential duties of teaching to that other employee. But as a matter of statutory interpretation, CPS's

reading is implausible. The ADA in plain terms identifies "the provision of qualified … interpreters" as a potential "reasonable accommodation." 42 U.S.C. § 12111(9)(B). If it is sometimes true that interpreters are a reasonable means of providing access to a disabled person, then the disabled person's conduct in delivering lessons, providing feedback to students, collaborating with other teachers, and participating in professional development programs are undoubtedly her own as a legal matter. (*See* Doc. 17, #409). The statute essentially recognizes that the interpreter merely acts as a conduit through which the deaf teacher communicates.

A contrary reading would turn the ADA on its head. Again, start with what we know as a matter of plain statutory text—at least sometimes, providing interpreters is a reasonable accommodation. 42 U.S.C. § 12111(9)(B). Yet, if it were true that communicating via an interpreter means that the function of communicating has shifted from the employee to the interpreter, then, under *Bratten*, interpreters would be a permissible accommodation under the statute only when the employee's job did not include, as an essential function, communicating with people. 185 F.3d at 632–33. It is implausible that the ADA would specifically identify an interpreter as a reasonable accommodation only to in turn limit its availability to jobs where communication is a "non-essential dut[y] or marginal function[]." *Id.* at 632.

The only case the parties and the Court can locate that addresses this issue, *Searls v. Johns Hopkins Hospital*, reached the same result the Court does here. 158 F. Supp. 3d 427, 437 (D. Md. 2016). In *Searls* a deaf nurse proposed an ASL interpreter as an accommodation. In response to an argument much like CPS's here,

the court held that an interpreter would not "reallocate[] the essential job functions of communicating with others and responding to alarms." *Id.* That is, the *Searls* court held that it was the nurse herself constructively communicating with the patients, not the interpreter.

Look at it another way. What if Zwicker's proposed accommodation were instead an automaton that performed the functions of an ASL interpreter instead of a human interpreter? It would be easy to understand that a mindless device could not assume Zwicker's duties of teaching or evaluating students for her. But much the same could be true for a live interpreter. Zwicker provides the content of the communication; the interpreter is simply the conduit through which she delivers it. In many ways, it is no different from a court reporter who provides closed captioning. The words are spoken by another, but the court reporter makes them available in real time as text. It is a highly valuable skill to be sure, but it does not make the court reporter the source of what is transcribed.

In its motion, CPS pushes back on this mere-conduit theory. It notes that a teacher's job also has an essential function of "managing classroom behavior." (Doc. 30, #1013–14). And it says that, when it comes to that function, as a practical matter, the interpreter will often do more than merely act as a conduit. (*Id.*). The interpreter may, for example, take it upon him- or herself to police inappropriate classroom behavior, at least to some extent. (*Id.*). And, if that is so, that means that Zwicker is not exclusively performing that function, which is arguably problematic under *Bratten*.

But at summary judgment, Zwicker need only make a "showing sufficient to establish" that she can perform the essential function of classroom management. *Celotex*, 477 U.S. at 322–23. She points to evidence that clears that bar. Specifically, Zwicker offers the testimony of her principal, Neal, who conceded that interpreters are not expected to manage behavior apart from relaying a teacher's instructions on that topic. (Doc. 15, #332–33). Neal likewise opined that, when provided with an interpreter, Zwicker was competent to be a teacher. (*Id.* at #319).

Of course, some record evidence also points the other way. Zwicker's email to aides during the lean months of the 2023–24 school year suggests that an interpreter might be a tad more than a medium. (Doc. 17-8). Specifically, while Zwicker stressed that aides or student interpreters should not engage in any teaching or instruction, she did say she wanted them to "intervene as needed" "in the event of a dangerous or harmful situation of bullying etc." (*Id.* at #523). Perhaps more damaging to her position here, she directed them to "help to get students' attention when [she is] trying to teach." (*Id.*). That seems to imagine a role beyond mere automated translation.

But the question here is whether Zwicker "*can* perform the essential functions" of her job with an accommodation, not whether she in fact has. 42 U.S.C. § 12111(8) (emphasis added). And, in fairness to Zwicker, she did not send the email discussed above to ASL interpreters; rather the aides involved filled in when CPS could not get an interpreter. (*See* Doc. 29-1, #994). So all the email demonstrates is something Zwicker freely admits—she needs an accommodation to allow *her* to do *her* job. Thus,

bearing in mind that the Court must draw all reasonable inferences in her favor, the Court concludes that Zwicker has created a genuine dispute of material fact on this issue. Fed. R. Civ. P. 56. Whether Zwicker, when provided with an ASL interpreter, can perform her job's essential functions is a question for the jury.

**2. Reasonable Accommodation**

Then there is the separate question of whether, even if it would enable Zwicker to perform the essential functions of her job, a full-time interpreter is a reasonable accommodation. For an ADA accommodation to be reasonable, it must be more than merely effective, or else the reasonableness requirement would be surplusage. *See US Airways, Inc. v. Barnett*, 535 U.S. 391, 400–01 (2002). An accommodation is reasonable if it "seems reasonable on its face," which is to say that it seems reasonable "ordinarily or in the run of cases." *Id.* Heeding the old adage that a definition should not include the word being defined, the Supreme Court added that an accommodation must be "plausible" or "feasible" in the run of cases. *Id.* at 402.

It is the next element of the definition, though, that proves vexing here. The Sixth Circuit has said, more than once, that in order to be reasonable an accommodation must be "proportional to cost." *Keith v. Cnty. of Oakland*, 703 F.3d 918, 927 (6th Cir. 2013) (quoting *Monette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1183 (6th Cir. 1996)). Put differently, the costs of the accommodation cannot "clearly exceed" the benefits. *Cehrs v. Ne. Ohio Alzheimer's Rsch. Ctr.*, 155 F.3d 775, 781 (6th Cir. 1998) (quoting *Borkowski v. Valley Cent. Sch. Dist.*, 63 F.3d 131, 138 (2d Cir.

1995)). Finally, the reasonableness inquiry's focus on the run of cases means that the individual facts of the case are (usually) irrelevant.[2]

Before discussing how that all plays out here, the Court pauses to address one preliminary issue—Zwicker's burden at summary judgment. It is true that she bears the burden of establishing that she can perform the essential functions of her job with a reasonable accommodation. But when it comes to showing what that reasonable accommodation is, she needs to clear only a fairly low bar. Her burden is merely one of production, and it is enough that she "suggest … a plausible accommodation, the costs of which, facially, do not clearly exceed its benefits." *Id.* (quoting *Borkowski*, 63 F.3d at 138.

Applying all of that, one might think that Zwicker's proposed accommodation clearly qualifies as reasonable. After all, the ADA explicitly contemplates that qualified interpreters will (at least sometimes) be reasonable accommodations. 42 U.S.C. § 12111(9). That said, the Court still must evaluate this particular accommodation and its circumstances in the context of the type of job at issue here. *See Keith*, 703 F.3d at 928–29; *Walsh v. United Postal Serv.*, 201 F.3d 718, 727 (6th Cir. 2000).

Take the elements—effectiveness, feasibility, and cost proportionality—in order. The first is straightforward. The ASL interpreter is certainly effective as to the portions of the job that are purely communicative. And, as the Court discussed above,

---

[2] Doing it any other way would blur the line between the reasonableness and undue hardship analyses. In addition to being doctrinally unhygienic, that would create practical difficulties—the plaintiff has the burden of proof on reasonableness and the defendant on undue hardship. *See US Airways*, 535 U.S. at 400.

whether an ASL interpreter would effectively allow Zwicker to perform the classroom control part of her job is at least genuinely disputed. *See supra*, Part A.1.

Second, the accommodation appears to be feasible or plausible "in the run of cases." *US Airways*, 535 U.S. at 402. Feasibility turns on whether something can be achieved. And here, CPS has consistently succeeded in obtaining interpreters since making a long-term contract with a local agency. (*See* Doc. 13, #224). True, an employer who "bends over backwards to accommodate a disabled worker … must not be punished for its generosity." *Vande Zande v. Wis. Dep't of Admin.*, 44 F.3d 538, 545 (7th Cir. 1995). But past success in providing an accommodation still at least suggests that it is feasible for CPS to provide this accommodation. True, CPS's challenges during the 2023–24 year could suggest that it may be impracticable for employers to provide a full-time ASL interpreter in the run of cases. But, during that school year, the school had not yet made a long-term contract and was attempting to get by with ad hoc requests to agencies. (*See* Doc. 13, #177, 223–24). And the record evidence suggests that there are many agencies in the Cincinnati area alone that provide these services. (*See, e.g.*, Doc. 17-7, #518). Extrapolating from that, Zwicker has at least identified a material factual dispute over whether, for most normal employers, it is feasible to obtain and provide full-time ASL interpreter coverage.[3]

[3] CPS does not raise the point, but feasibility concerns that don't rise to the level of unreasonableness can sometimes defeat damages claims. Courts cannot award damages (other than back pay, which is irrelevant here since CPS did not fire Zwicker) where the employer "demonstrates good faith efforts, in consultation with the person with the disability who has informed the covered entity that accommodation is needed, to identify and make a reasonable accommodation …." 42 U.S.C. § 1981a(a)(3); *see also* 42 U.S.C. § 2000e-5(g)(1). In other words, if CPS made such good faith efforts, Zwicker may be unable, as a matter of law, to obtain emotional distress damages, which is the only form of damages she seeks. But, as

The third element—cost proportionality—is where things get interesting. Most accommodations requests, after all, do not effectively double the cost an employer must pay to obtain the same output as it would from an unaccommodated employee. (*See* Doc. 29-1, #998–99). But, while the Sixth Circuit (and other courts) have expressly addressed cost proportionality as a limiting principle for reasonableness, none have adopted an actual test for when the cost of an accommodation "clearly exceed[s] its benefits." *Borkowski*, 63 F.3d at 138. Indeed, the cases are not even clear on what "the benefit" is for purposes of the comparison.

To explain that all a bit more fully, the concept of proportionality necessarily implies a comparison of one thing to another. A proportion, after all, is a kind of fraction, with a numerator and denominator. And, as a general matter, the identities of each here are clear. The Court must compare (1) the cost of the accommodation, to (2) the benefit that it provides. And the cost of the accommodation also seems straightforward—it is presumably the annual amount that CPS must pay to obtain acceptable ASL interpreting services. *See Keith*, 703 F.3d at 927. Although that is also perhaps supplemented by any incidental cost the accommodation imposes on the employer's normal operations—costs that may be difficult to quantify. *See Walsh*, 201 F.3d at 727 n.5; *Masters v. Class Appraisal, Inc.*, No. 2:17-cv-11283, 2019 WL 4597365, at *7 (E.D. Mich. Sep. 23, 2019). But still, the accommodation-cost part of the proportion is not that problematic.

CPS did not make any such argument in its brief, the Court declines to consider the issue further.

Rather, where things get really confusing is the remaining element. How does one measure, in dollar terms, the "benefit" that an accommodation—such as the ASL interpreter here—offers? In the case that started all this, *Vande Zande*, the Seventh Circuit said the metric was the "improvement in the life of a disabled employee." 44 F3d at 543. At first blush, though, this is a bit puzzling. Presumably the accommodation's benefit to the employee will always be very high—here, Zwicker cannot do her job without the accommodation. So the emotional benefit she obtains is presumably quite high, but difficult to quantify. Comparing that psychic benefit against the costs, if that is the inquiry, seems to call more for legislative judgments than a determination of objective reasonableness. True, there is a subset of cases where that might not be so. Imagine there are two or more potential accommodations, and the question is which the employer must provide. There it may be sensible for the benefit question to be employee-facing—is the marginal increase in quality of life provided by the employee's preferred accommodation minimal when compared to the difference in cost between that option and the one the employer prefers? Indeed, that was the case in *Vande Zande*. The Court held that an accommodation that cost $150—as opposed to the cost-free alternative offered by the employer—was unreasonable because its only added benefit was symbolic. *Id.* at 543.

But here, the parties agree that only one accommodation works. So the choosing-between-accommodations understanding of proportionality does not work. So maybe the answer is that, if the employer cannot offer an alternative, then courts need not perform a cost-benefit analysis as part of the reasonableness analysis at

all—the employer simply must provide the effective accommodation, cost notwithstanding (as a reasonableness matter), subject only to undue burden considerations (which CPS does not argue here).

The problem is that binding precedent forecloses that reading. Even in single-accommodation cases, the proffered accommodation's cost must be proportional. *See Cehrs*, 155 F.3d at 781; *Keith*, 703 F.3d at 928. Proportional to what, though?

The Sixth Circuit has not explicitly said. But, reading between the lines, the Court can at least narrow things down. The "benefit" is evidently linked to the value of the employee's labor to the employer. Consider an example. In *Walsh v. United Parcel Service*, the Sixth Circuit held unreasonable an employee's request for indeterminate, long-term medical leave. 201 F.3d at 727–28. The court identified the costs as administrative expenses, the employee's loss of work skills, and long-term uncertainty. *Id.* at 727 n.5. It then explained, in holding that the costs of the accommodation exceeded the benefits, that the benefit "must be significantly discounted by the obvious indeterminacy involved." *Id.* This description makes sense only if the benefit to which the court was referring is the benefit represented by the likely value the employee is expected to deliver once accommodated (i.e., it was unclear when the employee could return to work, so there was "indeterminacy" in evaluating that benefit). Were the benefit simply the "improvement in the life of [the] disabled employee," *Vande Zande*, 44 F.3d at 543, uncertainty over whether the accommodation would lead to the employee performing the job as normal would not be central to the inquiry; indeed it may be entirely irrelevant. *Accord Borkowski*, 63

F.3d at 138 n.3. So, the benefit at issue presumably refers to the benefit that the employer receives from the accommodated employee's ability to perform their job. And if that is the case, a rough estimate of that benefit presumably would be the salary that the employer pays the employee for performing that job. Thus understood, the "proportion" underlying the reasonableness analysis would be the cost CPS must pay to provide an ASL interpreter, on the one hand, as compared to Zwicker's salary, on the other.

Then, assuming that is correct, there is the separate question of when a cost becomes too great in light of the benefit. Admittedly, the normal point where a discussion of costs arises in an ADA case is in connection with the undue hardship defense. *See Monette*, 90 F.3d at 1183–84. But the Sixth Circuit has made clear that an employer who may not be able to show the severe strain required for that defense can still show that an accommodation's disproportionately high cost makes it objectively unreasonable. *Id.* Indeed, according to the case from which the Sixth Circuit adopted this framework, the cost proportionality aspect of the reasonableness requirement protects "an employer … so large or wealthy … that it may not be able to plead 'undue *hardship*.'" *Vande Zande*, 44 F.3d at 542. At the same time, this does not mean that courts must quantify the competing values and deem unreasonable any accommodation whose costs "however slightly" exceed its benefits. *Id.* at 542. Rather the Court must make a rough assessment of whether the costs clearly exceed the benefits in the ordinary case. *See, e.g.*, *Keith*, 703 F.3d at 928. As another influential decision cited favorably by the Sixth Circuit put it, the Court's role at this

stage is merely to screen out "outlandishly costly" accommodations. *Borkowski*, 63 F.3d at 139.[4]

So how does that cost-benefit analysis, thus understood, play out in this case? The costs here are steep. Creating and funding a full-time position is not something most organizations can take lightly. And, adding to that burden, this is skilled and often scarce labor. A normal organization, then, would likely need to create a salaried position entitled to the normal benefits enjoyed by full-time employees. That is what CPS tried to do here when it solicited candidates for a staff interpreter position. (Doc. 13, #170–71; Doc. 17-7, #516–20). And that was CPS's first choice—the cheaper option for addressing the problem. As was the case here, a request for a full-time interpreter would force many businesses to pay a premium for outside contractors. (*See* Doc. 19, #619–20 (Indalecio testifying that the cost for contracting interpreters for the 2024–25 year was over $113,400)). And this would continue year after year.

At the same time, the accommodation provides a substantial benefit. It enables Zwicker to do her job where otherwise she would not be able to teach. So CPS gets

[4] Further complicating matters is the mysterious character of the undue hardship defense. By its text, Title I directs courts to compare the costs of an accommodation to an employer's resources. *See* 42 U.S.C. § 12111(10). But some of the early cases seem to suggest comparing costs to benefits in the undue hardship analysis as well. *See Borkowski*, 63 F.3d at 142; *Vande Zande*, 44 F.3d at 543 (suggesting that even if the plaintiff makes the prima facie showing of cost-proportionality, the defendant can show that "upon more careful consideration the costs are excessive in relation … to the benefits"). And an early Sixth Circuit case seems to hold that "unreasonableness" is a separate defense from undue hardship. *See Cehrs*, 155 F.3d at 781. These uncertainties apparently persist. *See King v. Steward Trumbull Mem'l Hosp., Inc.*, 30 F.4th 551, 568 (6th Cir. 2022) (holding that, after the plaintiff passes the initial burden of positing an accommodation that passes *Cehrs*, the employer can show that the accommodation is unreasonable *or* that "a reasonable accommodation imposes an undue burden"). What is the nature of this "unreasonableness" defense? It may be a more searching cost-benefit analysis, as suggested by *Borkowski*. *See* 63 F.3d at 138 n.3, 142. Perhaps the Sixth Circuit will have an opportunity to clarify this.

the value of a competent ASL instructor out of the deal, which normally costs quite a bit to begin with. So from what the Court can tell from the record so far, there appears to be a rough parity between cost and benefit. The Court thus cannot condemn Zwicker's proposed accommodation as disproportionate to cost as a matter of law. *See Vande Zande*, 44 F.3d at 542 (holding an accommodation is not unreasonable merely because "the cost exceed[s] the benefit however slightly").

Zwicker has presented sufficient evidence to support her prima facie case, so her ability to perform her job's essential functions and her proposed accommodation's reasonableness are questions for the jury.[5] And while CPS perhaps could have pressed an undue burden argument, it chose not to do so. So, as things stand, there is a triable question on her discrimination claims—at least with respect to her entitlement to damages.[6] That said, exactly what the extent of those damages are—recall that CPS provided her an interpreter, but that coverage was spotty during the 2023–24 school year—remains an open question. But as no party moved for summary judgment on that issue, that too is a question for the jury. So, putting everything together, four main issues remain for trial: (1) whether Zwicker's § 12112(a)(5)(A) claim has merit, (2) whether she has suffered her claimed injury of emotional

[5] The Court notes here that the direct-evidence test is not a burden-shifting framework in the same way as the *McDonnell Douglas* inquiry, discussed below. *Cf. U.S. Postal Serv. Bd. Of Governors v. Aikens*, 460 U.S. 711, 714–16 (1983). So, at trial as here, Zwicker will have the burden of showing that her proposed accommodation enables her to perform the essential functions of her job. But her minimal burden on reasonableness remains, and CPS will have the burden of demonstrating an undue hardship. *See Cehrs*, 155 F.3d at 781; Ninth Circuit Manual of Model Civil Jury Instructions §§ 12.7–12.10, at 373–380 (2025 ed.).

[6] As a general matter, a litigant is not entitled to a jury on questions bearing only on equitable relief. *See Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 40–42 (1989); *Lytle v. Household Mfg., Inc.*, 494 U.S. 545, 550–51 (1990).

distress, (3) whether CPS's potential good faith defense forecloses a damages award here, *see supra*, n.3, and finally, (4) if Zwicker is entitled to damages, the amount of those damages.

## B. Zwicker's Retaliation Claim Fails Because She Has Not Offered Sufficient Evidence of Causation.

Zwicker's second claim is that CPS retaliated against her for requesting an accommodation. In her reply brief, she points to CPS's representatives' conduct at the November 2023 meeting discussed earlier. (Doc. 29, #976). Specifically, she argues that, by floating the possibility that she would stop working for the school, CPS made an actionable threat to fire her. *Id.* The ADA's retaliation provision, in relevant part, prohibits employers such as CPS from discriminating against employees because they "opposed any act or practice made unlawful" by the ADA. 42 U.S.C. § 12203(a). And, as mentioned above, the Sixth Circuit deems Ohio's employment discrimination law, R.C. § 4112.02, to "parallel[] the ADA in all relevant respects." *Daugherty*, 544 F.3d at 702. So the same analysis addresses both the federal- and state-law claim.

In cases like this one, where there is no direct evidence of retaliation, courts apply the *McDonnell Douglas* burden-shifting approach. *See A.C. ex rel. J.C. v. Shelby Cnty. Bd. of Educ.*, 711 F.3d 687, 697 (6th Cir. 2013); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). Step one of that framework requires Zwicker to make out a prima facie case by showing that: (1) she engaged in activity protected by the ADA; (2) CPS knew of that protected activity; (3) CPS took adverse action against her; and (4) the protected activity caused the adverse action. *A.C. ex rel. J.C.*, 711 F.3d at 697. If Zwicker establishes the prima facie case, then at step two the burden

shifts to CPS to demonstrate a "legitimate, non-discriminatory basis" for the challenged conduct. *Id.* If that happens, then at step three Zwicker, in turn, must prove by a preponderance that those reasons were in reality a pretext for retaliation. *DiCarlo v. Potter*, 358 F.3d 408, 414–15 (6th Cir. 2004). Here, the Court need not address steps two and three, though, as Zwicker fails to establish her prima facie case.

All agree that in requesting an accommodation, Zwicker engaged in protected activity. *See Bryson v. Regis Corp.*, 498 F.3d 561, 577 (6th Cir. 2007). Likewise, CPS was obviously aware of the request. But the third and fourth elements of the prima facie case are hotly contested.

Start with adverse action. *Zwicker* must demonstrate that "a reasonable employee would have found the challenged action materially adverse." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006). That requirement is met if the action "well might have dissuaded a reasonable worker from" engaging in the protected activity. *Id.* (quotations omitted). Zwicker was not fired or demoted, nor did she lose wages, after her accommodation request. To support her retaliation claims, she instead points to her testimony that Hoying "strongly recommended that [she] resign" at the November 2023 meeting, which she had thought was a "brainstorming opportunity" "to see about different accommodations." (Doc. 17, #438). She further testifies that, because of CPS's representations, she is "concerned about [her] future income." (*Id.*).

"[T]hreats alone can constitute an adverse action if the threat is capable of deterring a person of ordinary firmness from engaging in protected conduct." *Kubala v. Smith*, 984 F.3d 1132, 1140 (6th Cir. 2021) (quoting *Hill v. Lappin*, 630 F.3d 468, 474 (6th Cir. 2010)). If credible, it is easy to see how a threat to "the nature and existence of one's ongoing employment" could deter a reasonable person from requesting an accommodation. *Kessling v. Ohio St. Univ.*, No. 2:20-cv-1719, 2022 WL 17092250, at *7 (S.D. Ohio Nov. 21, 2022) (quoting *Fritz v. Charter Twp. of Comstock*, 592 F.3d 718, 728 (6th Cir. 2010)). So the real questions are (1) assuming Zwicker's account is accurate, whether Hoying's statement is a credible threat, and (2) whether, in fact, Zwicker's account of the exchange is accurate.

As to the first question, the Court concludes that a reasonable jury could find that Hoying's statement was a legitimate threat against Zwicker's employment. As always with the material adversity inquiry, "context matters." *Burlington*, 458 U.S. at 69. This is the context here: CPS called a meeting to discuss the parties' options because, as everyone agreed, Fall 2023's stopgap measures were not working and something had to give. (Doc. 29-1, #996–97). Nobody could think of an accommodation other than a full-time interpreter, and "it didn't seem like the interactive process was yielding any other option besides having a full-time interpreter in [Zwicker's] classroom or her not working in our schools." (Doc. 19, #611). Perhaps, assuming it happened, Hoying's suggestion was understandable in the situation, but it was at the very least the sort of thing a jury could conclude would put a reasonable person in fear of losing their "ongoing employment." *Kessling*, 2022 WL 17092250, at *7

(quoting *Fritz*, 592 F.3d at 728). That leaves whether Hoying actually made the statement. But, as witness credibility tops the list of things courts should leave to juries, the Court concludes that there is a genuine dispute of material fact on that front. In turn this means there is a triable question on adverse action.

But Zwicker stumbles on the fourth element of the prima facie case: but-for causation. To succeed on this front, she must put forth evidence "sufficient to allow 'an inference … that the adverse action would not have been taken had [she]' not engaged in protected activity." *A.C. ex rel. J.C.*, 711 F.3d at 699 (quoting *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000)). Zwicker's only evidence is that the alleged threat came rather soon after her request for an accommodation. But "temporal proximity alone will not support an inference of retaliatory discrimination when there is no other compelling evidence." *Nguyen*, 229 F.3d at 566 (quoting *Parnell v. West*, No. 95-2131, 1997 WL 271751, at *2 (6th Cir. May 21, 1997)).

Even assuming she made the prima facie case, CPS has an obvious alternative explanation in hand. The record supports only one obvious inference, both from the sequence of events and her account of the meeting: CPS made the alleged threat because it believed that Zwicker could not "perform the essential functions" of her job (at least not "without reasonable accommodation"). 42 U.S.C. § 12111(8). And at that time, CPS was consistently unable to find interpreters despite persistent efforts to do so. (Doc. 29-1, #992–93). So CPS's argument that "[a]ny discussion of [Zwicker's termination] at the meeting was simply a discussion about the realities of the situation" has force. (Doc. 24-1, #821). Consider what would have happened had

Zwicker not requested an accommodation, instead electing to teach without an interpreter. In that situation, CPS would have had the same interest in removing her as it did in reality.

And Zwicker has not presented any evidence to close this gap—evidence tending to show that CPS threatened her because of the request rather than merely reporting the facts on the ground. Not only that, but there is plenty of evidence to the contrary. For most of Zwicker's time at CPS, the school fully accommodated her. (*See* Doc. 29-1, #985, 997, 999–1000). And even during the times CPS failed to fulfill her requests, it expended significant time and effort trying to do so. (*Id.* at #988, 992–93). The Court also concludes that CPS diligently participated in the interactive process. *See* 29 C.F.R. § 1630.2(o)(3) (2026); *Tchankpa v. Ascena Retail Grp, Inc.*, 951 F.3d 805, 812 (6th Cir. 2020). Its representatives met with Zwicker several times to discuss her needs, considered potential alternative accommodations, and frequently communicated with her about their efforts to obtain an interpreter. (Doc. 29-1, #986, 989–90). Because there are no facts supporting causation, Zwicker has failed to make out the prima facie case for her retaliation claims. And even if she had, CPS has offered a legitimate alternative reason. So her retaliation claims fail.

* * *

Zwicker's raises triable questions on both her ability to perform the essential functions of her job and the reasonableness of her proposed accommodation, so she is entitled to a jury on her failure-to-accommodate claim. But her retaliation claims fail because she has not developed any evidence showing that CPS threatened to fire her

because of any of her protected activity. So CPS is entitled to partial summary judgment.

## CONCLUSION

For the reasons set forth above, the Court **GRANTS** CPS's Motion for Summary Judgment (Doc. 24) as to Zwicker's retaliation claims and **DENIES** it as to her failure-to-accommodate claims.

**SO ORDERED.**



September 28, 2026
**DATE**

**DOUGLAS R. COLE**
**UNITED STATES DISTRICT JUDGE**